STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-15-476

MARIA PASTULOVIC,

      Plaintiff

v.

SCARBOROUGH OPERATIONS,
LLC d/b/a PINE POINT CENTER

and

GENESIS HEALTHCARE, LLC,

      Defendants

JUDGMENT

STATE OF MAINE
Cumberland ss. Clerk's Office

APR 19 2017

RECEIVED

Jury-waived trial was held on count I of plaintiff's amended complaint, in which she alleges a violation of the Maine Human Rights Act (Whistleblower). By order dated November 3, 2016, summary judgment was granted on count II of plaintiff's amended complaint, defamation/libel. The court has considered the evidence and arguments of counsel. For the following reasons, judgment is entered in favor of defendants.

FACTS

After high school graduation, plaintiff obtained a certified nurseing assistant license and a home health aide assistant license. She then attended Becker College in Massachusetts, obtained her license as a practical nurse, and has been a registered nurse since 2000. From 1992 until 2000, she worked at Harrington Hospital in Massachusetts as a licensed practical nurse in the home care department. From 2000 to 2006, she worked at that hospital as a registered nurse in the medical surgical unit. Her patients included post-operative, dementia, and a variety of other

Plaintiff-Guy Loranger, Esq./Danielle Campbell, Esq.
Defendants-James Erwin, Esq./Elizabeth Rao, Esq.

1

patients. She also has a license in hospice and palliative care. (Pl.'s Ex. 62 (excluding Bate 165).)

After a ten-month leave, she worked at Hospice of Southern Maine for seven years as a case manager, and in quality assurance and admissions. For fewer than six months, she next worked at MedAssist/Beacon, which provides hospice services. In June 2014, she began work for defendant Scarborough Operations, LLC d/b/a Pine Point (Pine Point), a nursing home owned by defendant Genesis Healthcare, LLC (Genesis). She was hired as a charge nurse. (Def.'s Ex. 16.) There are no duties in the charge nurse job description that would be unknown to an experienced nurse.

Donna Trundy received a nursing degree in 1975 from Central Maine General Hospital. In January 2012, she began working for Genesis as Manager of Clinical Operations. She went to the Genesis buildings assigned to her to review clinical outcomes, which included listening to the morning report, walking through the building, reviewing records, and speak to the staff. She reported to the director of clinical operations, Donna Babineau. Ms. Trundy stopped working full time on October 2015. At the time of trial, she was working for Genesis on a per diem basis, filling in for the person who replaced her, who was on vacation.

Leslie Currier is a licensed multi-level nursing administrator and has been employed in the long term care industry for twenty seven years. At the time of trial she worked at Falmouth by the Sea and Foreside Harbor. Previously she worked at Pine Point from July 1999 to November 2015 as the nursing administrator.

Gayle Smith, the nurse practice educator at Genesis from 2009 until she retired on June 30, 2016, was responsible for orientation for new nurses. Tara Bucknell began working at Pine Point on September 14, 2014 and was the nurse manager of the skilled unit. At the time of trial,

2

Ms. Bucknell worked as a nurse at Spring Brook Center, a long term care facility owned by Genesis, and Janet Gervais was the Center Nurse Executive at Genesis, a position formerly known as Director of Nursing. During the 2014 time period, Erine Grant was the nurse manager of the long term care unit and Karen Farrington was the director of human resources and scheduling, both at Pine Point.

Orientation

The purpose of orientation is not to train on nursing skills. Instead, orientation includes exposure of new employees to practices, procedures, policies, and systems within Pine Point and Genesis, including the computer program, Port Client Care (PCC). (Def.'s Ex. 6.) Genesis's practices, training, and competencies follow standard nursing practice. Ms. Trundy was unaware of any written orientation policy. Nurses at the facility were trained to do orientation.

A new employee must demonstrate an understanding of the orientation topics through completion of competencies prepared by the employee and the nurse mentor and given to Ms. Smith. A tracking sheet is also kept for a new employee. (Pl.'s Ex. 64.) Ms. Smith filled out the tracking sheet as she received information. She requested plaintiff's competencies multiple times. Plaintiff did not state she was unable to complete the competencies because of problems with orientation. As of September 2, 2014, plaintiff had not turned in at least two thirds of the competencies she should have turned in. She never turned in a complete set. In other respects, however, she fulfilled all aspects of the orientation. During the orientation, documents were generated to show plaintiff had completed various elements of the orientation. (Def.'s Exs. 5-11; Pl.'s Ex. 64.) Plaintiff completed corporate compliance training, which is done annually. Plaintiff testified she had never seen the tracking tool kept for her, did not know what was meant

3

by the various categories listed, and did not recall talking to Ms. Smith about the items on the tool. (Pl.'s Ex. 64.)

The length of the orientation depends on the experience of a new employee. For an experienced nurse, a four to six week period of orientation is typical. Ms. Smith, Ms. Gervais, a nurse mentor, and a new employee discussed the length of the orientation. A thirty day and a sixty day evaluation are conducted by Ms. Farrington with a new employee to evaluate a new employee's performance. Plaintiff understood she would have a review after thirty days to determine whether there were concerns, issues, or questions and she would receive feedback as to her progress.

Ms. Farrington and Ms. Smith were involved in the selection of the nurse mentor for a new employee. The mentor did not receive special training and did not serve in a supervisory capacity.

During orientation, plaintiff was in a classroom with other employees. Ms. Smith provided instruction. (Pl.'s Ex. 4.) Plaintiff learned she would be paired with a staff nurse, Loretta Hynes, who was no longer employed at Pine Point at the time of trial. At Genesis, the staff nurse or charge nurse was the "desk nurse," who sat at the desk and obtained orders, made telephone calls, completed treatment sheets, worked with the unit clerk, handled admissions and documentation, and checked charts.

Pine Point has two units: Roadside, which provides for short-term, rehabilitating patients; and Marsh, which provides for nursing home level patients. Plaintiff was assigned to the Roadside unit. Plaintiff did not recall receiving training from Ms. Smith. (Pl.'s Ex. 5, PP230.) Plaintiff testified that at their first meeting, Ms. Hynes said she did not have time to train plaintiff on the staff nurse/desk position. As time allowed, Ms. Hynes oriented plaintiff to

4

the desk position. For her first week, plaintiff testified she worked on the floor as a certified nursing assistant (CNA) and partly at the desk. Frequently management moved staff to cover various needs.

Plaintiff testified she spoke to Ms. Hynes after the first week of orientation and asked if the next week could be more structured and oriented to the desk position. Ms. Hynes referred plaintiff to Ms. Gervais to ask about having additional staffing so Ms. Hynes could orient plaintiff. Plaintiff alleged she was being counted as the second nurse. The schedule reveals that second nurses were scheduled to work with Ms. Hynes during the July orientation. (Pl.'s Ex. 5.) Plaintiff testified that Ms. Hynes stated she had brought this issue to Ms. Gervais's attention previously, had been criticized, and thought feedback from a new employee might be more effective because Ms. Gervais's response had been that Genesis is never short staffed.

During plaintiff's second week of orientation, she testified she continued to perform mostly CNA duties and dispersed medicine, with some time spent with Ms. Hynes. At the end of the second week of orientation, plaintiff testified she was concerned because she was not shadowing Ms. Hynes and not learning the Genesis protocols for how and why things were done.

Plaintiff complained about short staffing, as did Ms. Hynes. Nurses refer to "short staffing" when someone on the schedule "called out." Complaints about staffing levels by staff occur daily at Pine Point and other facilities. When a scheduled staff person called out, Genesis replaced that member and sometimes a nurse manager, Ms. Gervais, or Ms. Smith would remain at the facility to help. Replacement on occasion came from other facilities and the replacement person's skill level was generally known. The needs of the patients were considered paramount. Genesis was never staffed below the state minimum requirements and, in fact, staffed above the state minimums.

5

<u>July Meeting</u>

Plaintiff recounted a meeting with Ms. Gervais in July 2014 to complain that Pine Point was short staffed, which affected plaintiff's orientation. Plaintiff did not allege Pine Point was staffed illegally. Plaintiff alleged Ms. Gervais pounded her fists on the table and told plaintiff that Genesis did not have staffing shortage issues. Ms. Gervais denied this allegation but did discuss time management with plaintiff and told her improvement was needed.

Plaintiff had special concerns about the medication Pyxis machine and the medication cart; plaintiff had not used a medication cart previously. She made a medication error twice, giving a patient two Vicodin pills as opposed to one pill during a six-hour period. Dispensing medicine is taught in nursing school. This error was reported to Ms. Hynes. Ms. Gervais believed, notwithstanding, that plaintiff was on track to complete her orientation successfully. Additional time for orientation could have been provided.

According to her testimony, when plaintiff discovered that a dressing was dated the day before but was signed off as having been done the day after, Ms. Hynes told plaintiff to take care of the dressing. Plaintiff was also told to circle the square on the form to indicate it was not done and to put her initials next to that circle to document that plaintiff took care of the dressing that day. Plaintiff agreed there was no violation of any documentation standard with regard to this practice.

<u>July 24 Meeting</u>

Based on plaintiff's concerns about orientation expressed to Ms. Gervais, a meeting was scheduled during the fourth week of orientation. Plaintiff, Ms. Gervais, Ms. Hynes, Ms. Currier, and Ms. Smith attended to discuss plaintiff's concerns about orientation. Ms. Hynes and plaintiff expressed concerns about each other and plaintiff complained she was not allowed to do or learn

6

the process and her job at Genesis. Ms. Gervais directed Ms. Hynes to spend more time orienting plaintiff to the desk position. Plaintiff also complained that she was not allowed to do certain tasks. Ms. Hynes explained that plaintiff was falling behind so Ms. Hynes completed the tasks so plaintiff would not fail. Plaintiff did not believe during her employment at Pine Point that she put anyone in danger, did anything illegal, or violated a standard of care and she did not tell anyone at Pine Point that she did any of those things.

When plaintiff's orientation ended, Ms. Farrington assigned plaintiff to work a shift as charge nurse by herself. When plaintiff learned she was assigned to provide orientation to Emma Boucher, plaintiff complained to Ms. Farrington. Ms. Boucher then complained to Ms. Currier about plaintiff's practices. (Pl.'s Ex. 9.) Plaintiff agreed at trial that the nursing environment was not completely safe. She agreed also that the keys to the medicine room and carts changed hands too many times during a shift. Ms. Boucher's letter to Ms. Currier was not discussed with plaintiff. Ms. Boucher was moved to a different unit and mentor. Her employment was not terminated because of her complaints.

On one occasion, plaintiff had an issue with Tori Cash, the director of admissions. Plaintiff expected a full discharge summary and an updated medication list when a new patient was admitted. Plaintiff testified Ms. Cash told plaintiff that the discharge summary and updated medication list were not required for patients from Southern Maine Medical. Plaintiff responded she would not accept the patient without documentation. No consequences resulted from plaintiff's decision. After inquiry, Ms. Currier stated a physician's signature was required to verify the discharge summary but not the medication list. Plaintiff had no knowledge of anyone receiving treatment at Pine Point without having appropriate paperwork in place.

7

Ms. Gervais and Ms. Smith prepared an evaluation of a new employee after thirty days of orientation. The evaluation form identifies improvements for the employee and sets goals for the next sixty days. A thirty day evaluation was prepared for plaintiff but disappeared before it was given to her. Before Ms. Gervais left for medical leave on August 4 through September 29, she met with plaintiff about plaintiff's concerns regarding insufficient staffing. Plaintiff was not pleased with Ms. Gervais's explanation about staffing. Ms. Gervais did not recall plaintiff's complaining about her orientation.

Ms. Smith signed off on plaintiff's orientation when she completed the PCC training and concluded plaintiff's orientation was full and complete. Plaintiff was able to log on as herself to Genesis's intranet and completed an unsigned survey about orientation, which was sent to the corporate office on September 7 or 15, 2014. (Pl.'s Ex. 61.) Neither Ms. Currier nor any one at Pine Point had any knowledge about this survey. Ms. Currier had never seen a survey completed by plaintiff or any other employee. Plaintiff complained that Ms. Smith and Ms. Hynes were not supportive and that plaintiff had never received a manual for orientation.

Ms. Bucknell described plaintiff as hesitant to receive education. Plaintiff's view was that she had been a nurse for a long time and knew how to do the task Ms. Bucknell was attempting to teach. Plaintiff did not ask for help and did not voice any complaints to Ms. Bucknell and never complained to Ms. Bucknell about anything plaintiff believed endangered patient safety or was not in compliance with the law, regulations, or standards of care. Ms. Hynes stated concerns to Ms. Bucknell that plaintiff was hesitant to receive information and was not receptive to orientation.

<u>September 10, 2014 Meeting</u>

On September 10, 2014. plaintiff met with Ms. Currier, Ms. Smith, and Ms. Bucknell to discuss documentation and an investigation. (Pl.'s Ex. 15.) Plaintiff testified at trial that she brought notes to the meeting about specific concerns and specific incidents and that Ms. Currier grabbed notes from plaintiff, said they were Genesis property, and stated that plaintiff would not participate in the investigation into documentation issues. Plaintiff testified at trial that she did not have a copy of the notes taken. (12/13/16 tr. 92.) She testified at her deposition that she kept a copy of the notes and used the notes to prepare the September 25 letter to Ms. Currier. (12/13/16 tr. 94.) The notes were not produced in discovery because plaintiff gave them to her lawyer or lost them. (12/13/16 tr. 95.)

Ms. Currier did obtain the papers at the meeting, which were clinical documentation notes and not plaintiff's notes about orientation. (Def.'s Ex. 28.) The notes remained at the facility because it would have been a violation of confidentiality requirements to allow plaintiff to retain notes with patient information. Plaintiff testified that only the last two pages of the notes contained her handwriting. (Def.'s Ex. 28.)

Discussed at the meeting was the concern that plaintiff documented treatment to patients before the treatment was provided. Plaintiff agreed at the meeting and at trial that she had predocumented treatment. She told Ms. Currier that "everybody does it that way." (12/14/16 tr. 109.) She testified that Ms. Hynes taught plaintiff to document treatment on charts at the beginning of the shift and that everyone does that. (12/13/16 tr. 84.) On one occasion, plaintiff documented having provided treatment to a patient who had been discharged and was not at the facility when the treatment was documented as having been provided. (Def.'s Ex. 1.) She did not

9

inform anyone about this mistake but, according to plaintiff, she should have circled those treatments on the chart, which she failed to do.

On another occasion, plaintiff documented at the beginning of her shift that she treated a patient's wounds when she had not. (Def.'s Ex. 2.) The patient reported the lack of treatment to Ms. Bucknell, who reported the incident to Ms. Currier and Ms. Grant. Plaintiff agreed at trial this was not a safe practice and that the practice was wrong. At the September 10 meeting, however, plaintiff did not respond to Ms. Currier's question as to whether predocumentation was consistent with proper nursing practice. Further, plaintiff did not acknowledge that what she was doing was wrong or that she would change this practice, despite not being able to report which treatments had been completed and which had not been completed. This predocumentation practice was contrary to Genesis policy. (Def.'s Ex. 3.) Plaintiff had never worked in any facility in which predocumenting services was an acceptable practice. She did not ask any other employee to identify a Genesis policy that showed this was an acceptable practice at Genesis facilities. Plaintiff did not discuss this practice with Ms. Smith or Ms. Gervais.

At Ms. Currier's request at the meeting, plaintiff wrote a document about an Omnicell password and the documentation practice. (Pl.'s Ex. 63.) Omnicell is a secure storage for medicine to be used until the pharmacy supplies the patient's medicine. Two nurses are required to count the medicine in the Omnicell and agency nurses do not have access. If two nurses are not present, the count cannot be completed. There was a concern that plaintiff had given the password to Ms. Boucher.

Ms. Bucknell described the September 10 meeting as challenging because plaintiff was hostile and did not accept responsibility for predocumentation or admit that the practice was wrong. Ms. Bucknell denied that anyone demeaned or humiliated plaintiff

10

At the conclusion of the meeting, plaintiff was suspended without pay pending the investigation with regard to improper documentation of medicine and treatment. Suspension is standard Genesis practice if a patient care issue is under investigation and there is a concern about a nurse working with patients. Plaintiff was told to leave Pine Point immediately. Plaintiff had previously received information about the corporate hotline and the human resources hotline available to employees with concerns.

An investigation of other nurses' notes began on the evening of September 10, based on plaintiff's statement that everyone predocumented. The investigation revealed that two nurses, Rosanna Renadette and Brittney Braasch, were predocumenting. Some members of management believed the three nurses should be terminated. Other believed the nurses could be reeducated. A decision to terminate three licensed nurses was significant. An in-service education was done with the staff regarding proper documentation.

<u>September 22, 2014 Meeting</u>

Because plaintiff had not heard from Pine Point since the September 10 meeting, she attempted to contact Ms. Currier and Ms. Smith on September 18. Plaintiff received a call and was asked to attend a meeting scheduled for September 22. She knew the topic for discussion would be the investigation into her documentation practices. Plaintiff testified she expected Patricia Colanton, regional vice president of human resources, would attend the meeting. Ms. Currier did not tell plaintiff Ms. Colanton would attend and plaintiff did not mention her expectation regarding Ms. Colanton at the meeting.

Plaintiff, Ms. Currier, Ms. Bucknell, and Ms. Grant attended the meeting. Ms. Bucknell and Ms. Grant prepared summaries of the meeting at Ms. Currier's request. (Pl.'s Exs. 23-24.[1]) Ms. Colanton did not attend. Ms. Currier explained that the meeting was to follow up and

---

[1] Plaintiff's exhibit 24 was not referenced during trial or offered into evidence.

update plaintiff on the investigation. Plaintiff produced a release and stated she wanted her personnel file, which she obtained subsequently. (Def.'s Ex. 12.) The release cites Title 26 of the Maine Revised Statutes. Ms. Currier left the room to copy the release and returned.

Ms. Currier first asked plaintiff to recount what had happened at the previous meeting because Ms. Grant had not attended that meeting. Ms. Currier intended next to discuss the investigation and determine whether plaintiff would accept what had happened, would acknowledge what had happened was improper, and would be able to return to Pine Point and provide safe care to the patients. Plaintiff stated at the outset that she would not be able to help. Ms. Currier explained the company policy that required employees to participate in an ongoing investigation. Plaintiff replied that she needed advice. When asked why she had not sought advice at the time of her suspension, plaintiff stated that she had sought advice and now that she had done what she was told to do, she needed more advice. She also stated at the meeting that she had been advised to get her personnel file. (12/13/16 tr. 129; (12/14/16 tr. 129.) Ms. Bucknell recalled that plaintiff also stated she had been advised not to speak. Plaintiff asserted that Pine Point presented a "hostile work environment," which was the first time Ms. Currier had heard that allegation from plaintiff. (Pl.'s Ex. 23; 12/14/16 tr. 188.) Plaintiff also alleged she had been subjected to hostile, demeaning, and humiliating treatment. (Pl.'s Ex. 23; 12/14/16 tr. 189.)

Plaintiff stated further at the meeting that she was not refusing to participate but needed additional advice before participating further. (Pl.'s Ex. 23; 12/14/16 tr. 191.) Ms. Currier again noted that the investigation had to be resolved and plaintiff's cooperation was needed. Ms. Currier showed plaintiff the provision in the employee handbook that required employee participation in an investigation. (Def.'s Ex. 13, Bate 069 ("If an employee is identified as a witness to or accused of a violation of Company policy or the law, he/she will be asked to

cooperate in the related investigation by speaking truthfully and candidly to an internal investigator in an interview and/or by providing a written statement documenting his/her knowledge. It is not acceptable to refuse to cooperate in a Company investigation and failure to comply may result in disciplinary action.").) Ms. Currier also showed plaintiff the provision in the handbook that provided for termination for obstructing or refusing to participate in an investigation. (Def.'s Ex. 13, Bate 072 ("Grounds for Immediate Dismissal: 11. Refusing to participate in or obstructing a Company Investigation.").) Ms. Currier wanted to resolve the matter as soon as possible because she had three nurses under suspension and a facility to operate in a safe manner.

Plaintiff agreed at trial she declined to answer questions without "some more advice or guidelines on proceeding with answering anymore questions." (12/13/16 tr. 128.) She agreed at her deposition that she needed further advice before she would answer any more questions. (Def.s' Ex 26.) She did not state at the meeting that she wanted someone from outside Pine Point to be at the meeting.

After consultation with regional, clinical, and operational staff, Ms. Currier made the decision to terminate plaintiff's at will employment at Pine Point because she would not participate in the investigation and would not answer questions. Plaintiff's employment at Pine Point was terminated on September 24, 2014 for refusing to participate in an investigation. Because of plaintiff's lack of cooperation, Ms. Currier could not continue the investigation and could not conclude plaintiff acknowledged her mistakes and would correct them. Ms. Currier was aware of plaintiff's complaints regarding her orientation but unaware of any other complaints from plaintiff.

13

Ms. Currier sent a termination letter to plaintiff dated September 24, 2014. (Pl.'s Ex. 17.) Ms. Currier informed Genesis management by email on the same date. (Pl.'s Ex. 16.) Plaintiff sent an email dated September 25, 2014 to Ms. Currier. Plaintiff listed her complaints and her expectation that the issues would be resolved internally. (Pl.'s Ex. 19.) Between September 22 and 25, 2014, plaintiff did not contact Pine Point and offer to participate in the investigation.

Ms. Currier contacted various members of management, including the corporate integrity and legal offices, to discuss the investigation and determine how to proceed. She also documented the termination, in part in response to a request from the Maine Human Rights Commission, and prepared a timeline of events involving plaintiff. (Pl.'s Exs. 57-58, 6.[2])

Plaintiff did not mention at the September 22 meeting the allegations contained in plaintiff's letter attached to her September 25, 2014 email. (Pl.'s Ex. 19.) At that time, there was no investigation into the orientation process but that investigation began upon receipt of plaintiff's email and letter. Ms. Currier believed Genesis fully investigated plaintiff's complaints.

With regard to the September 22 meeting and the September 25 email, plaintiff testified at trial as follows: "I was repeatedly told [at the September 22 meeting] I was refusing to cooperate with the investigation and that I would be terminated . . . And [Ms. Currier] just kept repeating that I was refusing to cooperate. She pointed out a policy that they had in their policy book that anybody who refuses to cooperate will be terminated . . . I believe I was told that I was terminated and I needed to leave the building and I was not to step foot on that property." (12/13/16 tr. 27-28.) Plaintiff was then shown by her attorney the email plaintiff sent to Ms. Currier, with copies sent to regional Genesis administrators, dated September 25, 2014 and was asked, "Does that help refresh your recollection that you didn't have notice of your termination

---

[2] Plaintiff's exhibit 57 was referenced during trial but not offered into evidence.

14

as of the time you sent this email?" (12/13/16 tr. 31; Pl.'s Ex. 19.) Plaintiff answered, "Probably, probably not, yeah." (12/13/16 tr. 31.) On cross examination, plaintiff testified that at the meeting, "[Ms. Currier] considered that I was not – that I was not participating and that that is ground for termination . . . I – I believe that's when she referenced that I was to leave the building and that I wasn't allowed back anywhere on the grounds . . . I consider that to be terminated." (12/13/16 tr. 135.)

### Payroll

With regard to payroll issues, plaintiff complained to Ms. Farrington that plaintiff was asked to backdate a job offer but she refused. (Pl.'s Ex. 2.) She also had not received a direct deposit or a paper paycheck. She was unsure whether the paycheck she received covered her pay to date. She believed the representation regarding deductions was inaccurate but had no pay stubs to verify her belief. Plaintiff received her pay stubs in October, after Genesis initiated an investigation. Plaintiff had concerns about not completing a health survey, although there were no consequences to plaintiff for failure to complete the survey. Finally, plaintiff believed there was a serious discrepancy between her hours worked and her direct deposit for pay. (Pl.'s Ex. 19, Bate 93.) Ms. Farrington said she would look into these complaints. Plaintiff also raised this issue with Ms. Colanton. (Pl.'s Ex. 41.)

Plaintiff received a reimbursement check for benefits that were deducted from her pay. She agreed at trial and at her deposition that she had been paid everything she was owed by Genesis.

### Post Termination

The employee handbook for Genesis lists six regional offices an employee may contact if the employee has an issue that cannot be resolved at the employee's location. (Pl.'s Ex. 1.)

15

Plaintiff had no contact with regional people until after her termination. She testified that she had emailed people from the regional office during her employment but the emails were returned. Those emails were not produced during discovery.

Plaintiff emailed Ms. Colanton on September 30, 2014 and complained about plaintiff's wrongful termination. (Pl.'s Ex. 29.) Plaintiff stated she was willing to cooperate and also raised the pay stub issue. On October 3, 2014, plaintiff sent an email to Ms. Colanton and on October 7, 2014, plaintiff sent an email to Ms. Trundy. (Pl.'s Ex. 38.) Plaintiff complained that she was cooperating with the investigation and complained about the shortfalls of her orientation. Plaintiff sent an email to Ms. Colanton on October 8, 2014 and stated that Pine Point is "awash with conflicts, regulatory and compliance problems." (Pl.'s Ex. 41; 12/13/16 tr. 200.) This complaint was part of Ms. Colanton's investigation.

Plaintiff spoke to Ms. Colanton and Ms. Trundy by telephone to review the events of her employment. At the direction of Wendy Labate, regional vice president of operations, Ms. Colanton requested that Ms. Trundy speak to plaintiff about her concerns, including staffing, orientation, and wanting more desk time. (Pl.'s Exs. 20-21, 27, 33, 37, 38, 42; see Pl.'s Ex. 19.[3]) Ms. Trundy was not aware of the survey plaintiff completed. Ms. Trundy also reviewed Ms. Gervais's notes and spoke to her about plaintiff's complaint about orientation. Ms. Trundy did not investigate plaintiff's allegation of retaliation. Plaintiff admitted to Ms. Trundy the predocumentation practices plaintiff used.

Ms. Trundy also interviewed Ms. Currier regarding staffing. Ms. Trundy found two occasions during a month of staffing on which Genesis was two hours short of the Genesis staffing level. (Pl.'s Exs. 45, 47.) The staffing level did, however, meet state guidelines. Plaintiff was not counted as a staff person during July 2014. (Pl.'s Ex. 5.)

---

[3] Plaintiff's exhibit 21 was referenced during trial but not offered into evidence.

Ms. Trundy spoke to Ms. Smith regarding plaintiff's complaint about unprofessional behavior on the part of Ms. Gervais and Ms. Smith. Ms. Smith believed they had acted appropriately and professionally and were generally straightforward in their dealings with people. Ms. Gervais had been on medical leave during August and September 2014. Ms. Trundy found that plaintiff had completed the orientation for most duties for the desk nurse position. (Pl.'s Ex. 37.)

Ms. Trundy summarized her lengthy conversation with plaintiff. (Pl.'s Ex. 37.) Ms. Trundy concluded the orientation could have been improved. Ms. Trundy summarized her interview with Ms. Hynes, who felt plaintiff received a poor orientation and was the second nurse on the floor. (Pl.'s Ex. 39.[4]) Neither Ms. Trundy not Ms. Smith agreed with that assessment. Ms. Hynes believed she should be orienting without having responsibility on the floor. Ms. Hynes also had a difficult time ensuring that plaintiff understood what was being taught. Ms. Hynes denied teaching plaintiff to document treatment before it was completed. Both Ms. Hynes and plaintiff believed Pine Point was understaffed and that their complaints were not listened to. Ms. Trundy disagreed that she did not listen.

Ms. Trundy summarized the results of her investigation. (Pl.'s Exs. 46-47.) She included recommendations to improve orientation. Ms. Currier discussed the recommendations with Ms. Gervais, Ms. Smith, and others. Some were implemented. Neither Ms. Gervais nor Ms. Smith received a copy of the report. The vice president of clinical operations concluded Ms. Smith was not completely performing her job. (Pl.'s Exs. 48-49.[5]) Ms. Trundy's investigation did not identify serious problems and did not result in findings consistent with plaintiff's complaints.

.

---

[4] Plaintiff's exhibits 39 and 40 appear identical. Both were referenced at trial. Plaintiff's exhibit 39 was admitted into evidence.

[5] Plaintiff's exhibit 48 was referenced during trial but not offered into evidence.

Ms. Smith collected every medication and treatment administration sheet for every nurse at Pine Point. Ms. Trundy audited the medical records during September and found predocumentation of services provided to a patient who was no longer at the facility. (Def.'s Ex. 1.) The audit showed that plaintiff had clearly predocumented treatments that were not done, contrary to proper nursing practice. (Def.'s Ex. 3.) Two other nurses were found to have predocumented. Both were suspended pending investigation. Ms. Renadette acknowledged her practice was not acceptable and was concerned about the implications to the residents and to her. She received a final written warning and the opportunity to move to the second shift where she would have greater oversight. (Pl.'s Ex. 14.) Ms. Braasch declined to speak to Pine Point representatives, refused to cooperate, and was terminated. (Pl.'s Ex. 18.) A review of Ms. Hynes's documentation revealed no instances of predocumentation.

Predocumentation can be considered falsification of documentation. When treatment is documented as having been done and is not done, the patient is at risk. The practice could affect the facility's license and participation in insurance programs.

Ms. Trundy was informed of plaintiff's termination. (Pl.'s Ex. 16.) Ms. Trundy agreed with that decision because of plaintiff's predocumentation practice. Ms. Trundy's investigation did not suggest retaliation by anyone at Pine Point against plaintiff.

On October 8, 2014, plaintiff sent another email to Ms. Colanton with a copy to Ms. Trundy. (Pl.'s Ex. 41.) Plaintiff raised, among other things, the payroll issues. She alleged damage control and cover up on the part of Pine Point. On October 9, 2014, plaintiff sent an email to Ms. Colanton and requested a reference for plaintiff's job search. (Pl.'s Ex. 43.) Plaintiff told Ms. Trundy that plaintiff wanted a full investigation and wanted to be fully

18

exonerated. Ms. Trundy believed she and Genesis cooperated with plaintiff but Ms. Trundy declined to exonerate plaintiff.

Aftermath

After plaintiff left her employment at Pine Point, she began work for Merrimack Valley Home Health Hospice in January 2015. She now earns more than she earned at Genesis, which paid $25.00 per hour for a total of $50,000 per year.

Plaintiff described working at Pine Point as considerably distressing and very stressful. She experienced insomnia and emotional distress. After her termination, she experienced sleepless nights because she felt the allegation that she had not cooperated in the investigation was not true. Her distress continued until she began work again.

CONCLUSIONS

Plaintiff alleges defendants' termination of her employment violated the Maine Human Rights Act (MHRA). 5 M.R.S. § 4572(1)(A) (2016); 26 M.R.S. §§ 831, 833(1)(A), (B), & (E) (2016). Plaintiff argues that she complained about insufficient staffing and her unsatisfactory orientation, both of which created a risk to the health and safety of the Pine Point residents, and she complained about her wages. (Pl.'s Br. 3.) She argues that the stated reason for her termination, that she refused to participate in an investigation, was a pretext. (Pl.'s Br, 2.)

To prevail on her claim of unlawful retaliation in violation of the Maine Whistleblower Protection Act, plaintiff must prove "(1) [she] engaged in activity protected by the statute; (2) [she] was the subject of an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action." Caruso v. Jackson Lab., 2014 ME 101, ¶ 11, 98 A.3d 221. Under the MHRA, unlawful employment discrimination includes an employer discriminating "with respect to hire, tenure, promotion, transfer, compensation, terms,

conditions or privileges of employment or any other matter directly or indirectly related to employment" because of a protected activity. 5 M.R.S. § 4572(1)(A) (2016).

Plaintiff complained about short staffing and the orientation process in July. No adverse action was taken against plaintiff at the time of her complaints. See Watt v. UniFirst Corp., 2009 ME ¶ 47, 969 A.2d 897. Such complaints may be protected activity. 26 M.R.S. §§ 833(1)(A), (B), (E); see Cormier v. Genesis Healthcare, LLC, 2015 ME 161, ¶ 15, 129 A.3d 944. In this case, based in part on plaintiff's testimony, the court concludes the complaints were not protected activity. Pine Point began an investigation of improper documentation immediately upon learning of it. Pine Point began an investigation of its orientation process immediately upon learning of plaintiff's complaints in the September 25 email. No employee who complained about staffing and orientation, including plaintiff, Ms. Hynes, and Ms. Boucher, was terminated because of those complaints.

Based on her very serious improper documentation practice, plaintiff was suspended on September 10. Without question, she sought advice before the next meeting on September 22. She acted on that advice when she requested her personnel file with a prepared release, refused to speak to Pine Point representatives, and alleged that she had been subjected to hostile, demeaning, and humiliating treatment and a hostile work environment at Pine Point. It is unlikely plaintiff was aware of the statute that permits an employee to review and copy her personnel file. 26 M.R.S. § 631; (Def.'s Ex. 12.) It is further unlikely plaintiff typically uses the word, "hereby," or the term, "hostile work environment."

At the September 22 meeting, plaintiff stated that she would not be able to help. Contrary to the requirement to speak "truthfully and candidly to an internal investigator,"

20

plaintiff refused to speak at all to Ms. Cormier. (Def.'s Ex. 12.) Plaintiff refused to cooperate and participate in the investigation, contrary to the written Genesis policy shown to her.

Plaintiff's argument that she should have been given additional time after the September 22 meeting to seek further advice is not reasonable. Eleven days elapsed between September 10 and September 22. Plaintiff called Pine Point because she had not heard from anyone. On September 22, Pine Point was operating with three nurses under suspension and required a determination of whether the nurses could be reeducated or would be terminated. Under these circumstances, declining to cooperate until additional advice is received at an unspecified time after an eleven day suspension is a refusal to cooperate and participate.

The court found the testimony of Ms. Trundy, Ms. Gervais, Ms. Smith, Ms. Currier, and Ms. Bucknell, in particular, to be generally credible, although some witnesses were somewhat protective of Genesis. The court found the testimony of plaintiff, in several instances, to be not credible. Plaintiff knew she had been terminated when she left the September 22 meeting and when she sent the September 25 email and attached letter. That email and letter contained complaints never previously conveyed, complaints that were false, and complaints that were self-serving.

Despite, among other things, plaintiff's documentation of treating a patient who was no longer at the facility at the time of the alleged treatment and her inability to identify which predocumented treatments had been completed and which had not, she refused to cooperate at the September 22 meeting into the investigation of the practice of predocumentation. The nurse who cooperated and admitted that her predocumentation practice was very concerning was given a warning and retained her employment. The two nurses who refused to cooperate and participate in the investigation were terminated pursuant to Genesis policy. Plaintiff was

21

terminated for that reason and only that reason.  See Walsh v. Town of Millinocket, 2011 ME 99,

¶ 25, 28 A.3d 610.

The entry is

Judgment is entered in favor of Defendants, Genesis Healthcare, LLC and Scarborough Operations, LLC d/b/a Pine Point Center and against Plaintiff Maria Pastulovic on Count I of Plaintiff's Amended Complaint.

Date:  April 18, 2017

Nancy Mills
Justice, Superior Court